**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

O.H. and M.H., infants by their mother and natural
guardian, JACQUILINE HINKLE, and JACQUILINE
HINKLE, individually,                                           3:22-cv-00930 (BKS/ML)

                                    Plaintiffs,

v.

NATIONAL VISION, INC., individually and doing
business as AMERICA'S BEST CONTACTS &
EYEGLASSES,

                                    Defendant.

**Appearances:**

*For Plaintiffs:*
Gamaliel B. Delgado
Ryan A. Carlson
Joseph A. Kopacz
Morgan & Morgan, N.Y. PLLC
199 Water Street, Suite 1500
New York, NY 10118

*For Defendant:*
Aaron M. Schiffrik
William H. Hython
Goldberg Segalla LLP
5786 Widewaters Parkway
Syracuse, NY 13214

Hon. Brenda K. Sannes, Chief United States District Judge:

## MEMORANDUM-DECISION AND ORDER

## I.     INTRODUCTION

Plaintiff Jacquiline Hinkle brings this action for negligence on behalf of herself and her minor daughters, O.H. and M.H., against Defendant National Vision, Inc.[1] (Dkt. No. 2). Plaintiffs allege that Defendant negligently hired, retained, and supervised a former employee, Nicholas Vicioso, who engaged in lewd conduct in front of Hinkle's minor daughters. (*See generally id.* at 5–19). Defendant moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure on December 13, 2024. (Dkt. No. 141). The motion has been fully briefed. (*See* Dkt No. 141-35; Dkt. No. 143; Dkt. No. 149). For the following reasons, Defendant's motion is granted.

## II.     FACTS[2]

### A.     August 10, 2019 Incident

Hinkle stated that she brought her two daughters, O.H. and M.H., to her vision exam appointment on the morning of August 10, 2019. (Dkt No. 141-33, at 5). Her appointment was at America's Best Contacts & Eyeglasses in Ithaca, New York, (*id*; Dkt. No. 141-17, at 38), which was "owned and operated" by Defendant. (Dkt. No. 143-3, at 6). Hinkle testified that when she arrived, she was greeted by Vicioso. (Dkt. No. 141-17, at 48). It is undisputed that he was then employed as an optometric technician at America's Best in Ithaca. (Dkt. No. 141-34, ¶ 18; Dkt.

---

[1] Plaintiffs commenced suit in New York Supreme Court, Tompkins County, and Defendant removed the matter to federal court based on diversity jurisdiction. (Dkt. No. 1 (notice of removal); Dkt. No. 22 (amended notice of removal)).

[2] The facts are drawn from Defendant's statement of material facts, (Dkt. No. 141-34), Plaintiffs' response to Defendant's statement of material facts and Plaintiffs' statement of additional material facts, (Dkt. No. 143-1), to the extent the facts are well-supported by citations to the record, as well as the exhibits attached thereto and cited therein. The facts are construed in the light most favorable to the Plaintiffs as the non-moving parties. *See Dall. Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

No. 143-1, at 11). Dylan Muckey, then a sales associate and key holder at America's Best in Ithaca, (Dkt. No. 141-14, at 13–14, 21), testified that technicians like Vicioso were responsible for prescreening patients before taking them to see the optometrist. (*Id.* at 29–30).

Hinkle stated that Vicioso led her and her daughters to the exam room. (Dkt. No. 141-17, at 48). She sat in a chair situated "right when [she] walked in[to]" the room near "two tables . . . with about four machines set on them." (*Id.* at 52–53). O.H. and M.H. went to a seating area on the left side of the room. (*Id.*). Vicioso "shut the door," "dimmed the lights," (*id.* at 53), and sat in a chair across from Hinkle. (*Id.* at 52–53). He instructed Hinkle to "go into the first machine and do what the machine . . . asked [her] to do." (*Id.* at 54).

Hinkle remembered that she "had to use all four machines," (Dkt. No. 141-33, at 5), and would "roll[] [her] chair from machine to machine down the table" to move from one test to the next. (Dkt. No. 141-17, at 59). Each machine required her to put her eyes "in the machine." (*Id.* at 56). She could not see "anything outside of the machine." (*Id.*). In addition, there were "pieces of equipment or parts of the machine that [were] blocking [her] vision from anything else in the room." (*Id.*). Each machine was also "loud." (*Id.* at 75). Although she heard Vicioso giving her directions during the testing, she did not hear anything else. (*Id.* at 65).

Hinkle recalled that she had never before taken two of the four tests, and "questioned it in the moment." (*Id.* at 57). The two new tests were "five minutes apiece" and took "longer" than the other two tests. (*Id.*). Hinkle testified that "[i]n all her years of getting [her] eyes checked, [she had] never had an exam take [that] long." (Dkt. No. 141-33, at 5). She noted that "[u]sually it only [took] 5 minutes to complete an exam but this exam took approximately 15 minutes." (*Id.*).

Various employees who worked at America's Best in Ithaca in August 2019 testified regarding the proper length of a prescreening exam, with answers ranging from five minutes to twelve minutes. (*See* Dkt. No. 141-5, at 69; Dkt. No. 141-23, at 25; Dkt. No. 141-14, at 39–40; Dkt. No. 141-30, at 25). The assistant manager, Mindy Swansbrough, stated that "[i]f there was ever a patient in the prescreening room for more than even ten minutes, [she] or [the manager,] Angel [Martinez] would go in there to see what was going on." (Dkt. No. 141-23, at 25). If there was no manager on site, Swansbrough testified that the eye doctor, Dr. Hallstrom, would have checked in if the technician took "too long or he was waiting and he thought it was weird." (*Id.* at 32).

When the testing was completed, Hinkle noted that Vicioso was holding a napkin in his hand that he threw away before letting Plaintiffs out of the room. (Dkt. No. 141-17, at 61). While he was escorting them back to the waiting room, Hinkle's younger daughter "tugged at [Hinkle's] shirt" and whispered, "Mommy, that doctor pulled out his wiener and was pulling on it." (*Id.* at 62–63). Hinkle "was a little concerned at what she was saying" and responded that they would "talk about [it] in the van, because [Hinkle] didn't understand what [her younger daughter] was saying." (*Id.* at 63–64).

Hinkle testified that she sat with her daughters in the waiting room for about five minutes before being called into a different room for an eye exam with the optometrist. (*Id.* at 64, 66). When the appointment was finished, Hinkle returned to the van with her daughters and "immediately brought the conversation back up" that her younger daughter had initiated earlier. (*Id.* at 73).

According to Hinkle, her younger daughter "proceeded to tell [Hinkle] that Nicholas Vicioso . . . unzipped his pants, pulled his wiener out of his pants and was pulling on it, and pus

4

came out." (*Id.* at 73–74). Hinkle looked at her older daughter and said, "really?" (*Id.* at 75). Her older daughter replied, "[Y]es mom, she's telling the truth. He unzipped his pants, pulled his wiener out and was pulling on it and smiling at me." (*Id.*). Hinkle's older daughter also stated that "pus came out" and that Vicioso "grabbed a napkin or a tissue to clean it up, because it dripped on the floor." (*Id.*).

Hinkle testified that she asked her daughters to identify the man they were discussing by pointing him out through the glass windows of the building. (*Id.* at 76). When her daughters identified Vicioso, Hinkle called her husband, and then the police. (*Id.* at 76–77). The police arrived and brought Vicioso outside so that Plaintiffs could identify him. (*Id.* at 80–81). Hinkle identified him as the man who conducted her prescreening exam, and her daughters identified him as the man they saw masturbating during that exam. (Dkt. No. 141-33, at 6). Vicioso was arrested for public lewdness and endangering the welfare of a child. (*Id.* at 2–4).

Defendant employed a general manager, Angel Martinez, and an assistant manager, Mindy Swansbrough, at the America's Best in Ithaca on the date of the incident. (Dkt. No. 141-5, at 9–10; Dkt. No. 141-23, at 10, 14–15, 17). Martinez testified that was not working at the store that day. (Dkt. No. 141-5, at 20). Swansbrough stated that she was not initially at the store either, (Dkt. No. 141-23, at 26), but arrived when she was informed of the incident, (*id.* at 36), and told police that Vicioso was not welcome back to the store. (*Id.* at 43). The district manager overseeing the America's Best in Ithaca, Dudley Purbeck, (*see* Dkt. No. 141-12, at 39), testified that Vicioso was officially terminated later that day. (Dkt. No. 141-13, at 17).

Todd Rodabaugh, who was working as a licensed optician at America's Best in Ithaca on the day of the incident, (Dkt. No. 141-30, at 8–9, 11, 16), testified that the police officers on the scene "brought in a blue, black light for the pretest room to see where [Vicioso] had masturbated

and told [the employees] where to clean up." (*Id.* at 34). He recalls that they had to clean "multiple areas" of the floor "under the desk." (*Id.* at 35, 37). Vicioso told law enforcement that he had "touched himself for sexual gratification with other patients 3-5 times." (Dkt. No. 141-33, at 20). Neither party disputes that the Ithaca County Police Department issued a press release asking witnesses or individuals with information to come forward, but did not receive any responses. (Dkt. No. 141-34, ¶¶ 34–35; Dkt. No. 143-1, at 7).

### B.      Defendant's Hiring of Nicholas Vicioso

Vicioso applied to work for Defendant on February 7, 2019. (*See* Dkt. No. 141-34, ¶ 11; Dkt. No. 143-1, at 2). Defendant's job application asked for information such as the prospective employee's availability, employment history, professional references, and whether the applicant had "ever been convicted of a crime (including any guilty or nolo contendre plea) and/or received any type of sentence, including but not limited to probation." (Dkt. No. 156-1, at 2–4).

Vicioso's completed application indicated that he was available to work from "8:30-7:15" from Monday to Saturday. (*Id.* at 2). The "Employment Record" section included information for three previous employers, (*id.* at 3), and the "Professional References" section included contact information for four individuals. (*Id.* at 4). Vicioso marked the box for "no" when asked whether he had been convicted of a crime. (*Id.* at 2)

The general manager, Martinez, indicated that he did not run a background check on Vicioso because he did not "do it for any other associates except for management and key holders." (Dkt. No. 141-5, at 61). He did not contact any of the employers listed in the "Employment Record" section, (*id.* at 59), or any of the references listed in the "Professional References" section. (*Id.* at 61–62). He said that it was his choice not to contact any of Vicioso's references and explained that it was generally "not necessary" to check a prospective employee's references. (Dkt. No. 141-6, at 8).

Martinez testified that that he conducted Vicioso's interview. (Dkt. No. 141-5, at 31). He does not recall being trained on Defendant's interview process, (*id.* at 12), but indicated that Defendant provided him with a "format" for interviews which included "questions that you can ask . . . but that's about it." (*Id.* at 13). Vicioso's interview lasted about "a half hour." (*Id.* at 66). "[Martinez] spoke with him . . . [and] gave him a roundabout gist of the job that he was applying for. [He] showed [Vicioso] the machinery he was going to be working with. And that[] [was] pretty much it." (*Id.* at 31).

In preparation for this lawsuit, Defendant's expert, Steven Millwee, completed a criminal background check on Vicioso, which revealed three misdemeanor convictions from 2015–2018, one of which was for forcible touching. (Dkt. No. 141-29, at 59–60).

### C.    Defendant's Hiring Policies

Leslie Ramey, Defendant's corporate representative, (*see generally* Dkt. No. 141-18; Dkt. No. 141-20), testified that "managers [were] trained on how to find and select good candidates" for employment and "store managers ma[d]e [hiring] decisions independently as far as who join[ed] their team." (Dkt. No. 141-18, at 112). Defendant expected store managers to "apply [the training] as they hire[d]." (Dkt. No. 141-20, at 63).

The training document instructs managers to "conduct reference checks." (Dkt. No. 143-7, at 19). In addition, Defendant's "Human Resources Policies & Procedures," includes a section entitled "General Guidelines" underneath a heading called "Policy Requirements." (Dkt. No. 143-6, at 1). It states: "Check all references listed on the application." (*Id.*). During Ramey's deposition as a fact witness, (*see generally*, Dkt. No. 143-3), she stated that Defendant's process for hiring employees included "check[ing] references." (*Id.* at 5). Swansbrough agreed during her deposition that "it [was her] understanding that National Vision policy was to call and check references for employees during the application process." (Dkt. No. 141-24, at 8).

Although Ramey, testifying as the corporate representative, noted that store managers had the discretion to make hiring decisions "independently," (Dkt. No. 141-18, at 112), "[a]dditional policies and procedures [were] geared around the background check process." (*Id.*). Defendant did not have "a procedure for background checks that [was] specific to America's Best . . . One document exist[ed] for [Defendant's] entire retail space." (*Id.* at 39). The written policy section entitled "Criteria" identifies the employees subject to a background check. [3]

Ramey clarified that while "[a]ll National Vision associates that work inside a host store environment or our corporate, regardless of position, require a background check," (Dkt. No. 141-18, at 123), "America's Best optometric technicians [were] not required to take background checks." (*Id.* at 133). The only other location with optometric technicians "[was] in the Walmart side of [Defendant's] business." (*Id.* at 124). Technicians operating in Walmart [were] required to undergo a background check because Defendant "ha[d] an arrangement with Walmart . . . so [it was] complying with the host store requirement." (*Id.*). However, regardless of employment location "[u]pon being notified that somebody [was] on probation, that [was] in a position similar to [Vicioso], which was a non-key-holder, non-member of management . . . a background check would be conducted." (*Id.* at 113–14).

---

[3] The policy, which was in effect in 2019, according to Ramey, (*id.* at 31), provides:

All Walmart, Fred Meyer, Corporate and AC Lens associates, regardless of position, must pass a criminal background check to be employed with our organization.

All candidates for management and key-holding positions must pass a criminal background check to be employed with our organization.

All rehire candidates must pass a background check if they are being rehired into a Third Key, Management, Walmart, or Fred Meyer store position regardless of when the last background was completed.

Any candidate noting on their application for employment that they have a prior conviction must undergo a background check to be employed with our organization. The application for employment must include the nature of the conviction and details surrounding the conviction.

(Dkt. No. 143-4, at 1).

### D.      Knowledge that Vicioso Was on Probation

Dylan Muckey, who was then a sales associate and key holder at America's Best, (Dkt. No. 141-14, at 13–14, 18, 21), lived with Vicioso from May to August of 2019. (*Id.* at 30). Muckey testified that he knew Vicioso was on probation because his "probation officer actually had to come to [their] apartment and check it." [4]  (*Id.* 141-14, at 30–31).

Martinez testified that he "didn't know [Vicioso] was on probation." (Dkt. No. 141-6, at 10). Although Martinez could not recall what Vicioso's schedule was, (*id.*), Martinez denied that he had ever scheduled around Vicioso's probation officer meetings three times a week. (*Id.* at 11). He testified that "nobody got three days off a week. If you're full-time, you get a Sunday off and another day throughout the week. That's it." (*Id.*). Swansbrough likewise testified that she never knew Vicioso was on probation during his six-month-long employment. (Dkt. No. 141-24, at 14). Ramey, in her capacity as corporate representative, testified that Defendant "had no knowledge" that Vicioso was on probation. (Dkt. No. 141-20, at 145). In addition, Defendant was not aware of any complaints against Vicioso before he was fired. (*Id.* at 103).

## III.    STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson*, 477 U.S. at 247. The moving

---

[4] Muckey believed that the managers, Martinez and Swansbrough, knew that Vicioso was on probation because Vicioso told Muckey that "he let them know." (*Id.* at 36).  Muckey testified that Vicioso "told [Martinez and Swansbrough] that like he had specific days that he couldn't work because he had to go to probation so they knew. They were fully aware." (*Id.*). For the reasons stated *infra* in Section IV.B., the court does not consider Muckey's testimony regarding what Vicioso told Muckey because it is inadmissible hearsay. *See AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 318 (N.D.N.Y. 2021) ("The Court may only consider admissible evidence in ruling on a motion for summary judgment." (citation and internal quotation marks omitted)).

party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dall. Aerospace, Inc*, 352 F.3d at 780 (citation omitted). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or

denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.    DISCUSSION[5]

### A.    Negligent Hiring

To state a claim for negligence under New York law, the plaintiff must show: "(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Ferreira v. City of Binghamton*, 194 N.E.3d 239, 245–46 (N.Y. 2022) (quoting *Solomon v. City of New York*, 489 N.E.2d 1294, 1294 (N.Y. 1985)). When the negligence claim arises from an employee's hiring, the plaintiff must demonstrate that "the employer knew or should have known that the employee had a propensity for the conduct which caused the plaintiff's injury." *Olsen v. Butler*, 211 N.Y.S.3d 476, 478 (App. Div. 2024) (citations and brackets omitted).

Defendant argues that it is entitled to summary judgement on the negligence claims arising from Vicioso's hiring because "Defendant was under no duty to conduct a criminal background check and/or to inquire as to whether Nicholas Vicioso had been convicted of crimes in the past." (Dkt. No. 141-35, at 8). Plaintiffs respond that "[s]ummary judgment is not appropriate here because there is evidence in the record from which a reasonable jury could conclude that National Vision failed to adequately and reasonably conduct an inquiry into Nicholas Vicioso's background." (Dkt. No. 143, at 12). This evidence includes Defendant's

---

[5] Plaintiffs' complaint asserts causes of action for loss of consortium. (*See generally* Dkt. No. 2, at 19–21). Plaintiffs, in their response to Defendant's motion for summary judgment, agreed that summary judgment on these claims is appropriate, (Dkt. No. 143, at 18 n.4), so the court dismisses them. *See George v. Windham*, 94 N.Y.S.3d 363, 366 (App. Div. 2019) (affirming dismissal of the plaintiff's cause of action for loss of her children's society because New York law does not permit a parent to recover "for the loss of a child's affection and companionship when a child is injured." (quoting *DeAngelis v. Lutheran Med. Ctr.*, 445 N.Y.S.2d 188, 195 (App. Div. 1981))).

"fail[ure] to conduct any inquiry into Nicholas Vicioso's background before hiring him" and its failure to follow its "own policies [which] require background checks before hiring optometric technicians." (*Id.*) (emphasis omitted).

Under New York law, it is well settled that "[t]here is no common-law duty to institute specific procedures for hiring employees unless the employer knows of facts that would lead a reasonably prudent person to investigate the prospective employee." *Hashimi v. Gap, Inc.*, 221 N.Y.S.3d 664, 666 (App. Div. 2024) (citations omitted) (reversing denial of defendants' summary judgment motion on the plaintiff's negligent hiring claim); *KM v. Fencers Club, Inc.*, 83 N.Y.S.3d 197, 199 (App. Div. 2018) (citations omitted) (reversing denial of defendant's summary judgment motion on the plaintiff's negligent hiring claim, reasoning that "there was no evidence that [the defendant] had knowledge of any facts that would have caused a reasonably prudent person to conduct a criminal background check on [the employee]"); *Bouchard v. N.Y. Archdiocese*, 719 F.Supp.2d 255, 262 (S.D.N.Y. 2010) (granting summary judgment for the defendants on the plaintiff's negligent hiring claim, brought under New York law, finding that "[the defendants], however, had no duty to investigate [the employee] . . . when they had no reason to believe that he would [sexually abuse parishioners]"); *accord Sandra M. v. St. Luke's Roosevelt Hosp. Ctr.*, 823 N.Y.S.2d 463, 468 (App. Div. 2006) (affirming grant of summary judgment for the defendant on the plaintiffs' negligent hiring claim, stating that "[t]he record in this case does not show that the [defendant] had any reason to request an employment history or background check for [the employee]); *Amendolara v. Macy's N.Y.*, 241 N.Y.S.2d 39, 40 (App. Div. 1963) (modifying the judgment to vacate the verdicts on the plaintiffs' negligent hiring claim, holding that the defendant "was under no duty to inquire into the possibility that [the employee] might have been convicted of crime in the past" and stating that "before the incident

in question nothing transpired to alert [the defendant] to the possibility that such an incident might occur").

Plaintiffs have failed to adduce any evidence from which a jury could find that Defendant was aware of "facts that would lead a reasonably prudent person to investigate [Vicioso]" at the time he was hired. *See Hashimi*, 221 N.Y.S.3d at 666. Neither party disputes that on his job application, Vicioso checked the box "no," when asked whether he had "been convicted of a crime . . . and/or received any type of sentence, including but not limited to probation." (Dkt. No. 141-34, ¶ 13; Dkt. No. 143-1, at 2).

The evidence also shows that Vicioso was available to work full time. His completed job application indicated that he was available to work from "8:30-7:15" from Monday to Saturday. (Dkt. No. 156-1, at 2). Plaintiffs contend that the manager and assistant manager at America's Best in Ithaca were "'fully aware' that Nicholas Vicioso was on probation when he was hired because Vicioso told them the specific days he could not work due to having to go to probation meetings." (Dkt. No. 143-1, at 17) (quoting Dkt. No. 141-14, at 36). But there is no admissible evidence to support that assertion.[6] And when asked whether Vicioso needed time off to see his probation officer "three . . .days each week," the manager responded that "nobody got three days off a week. If you're full-time, you get a Sunday off and another day throughout the week. That's it." (Dkt. No. 141-6, at 11).

Plaintiffs' other argument, that a reasonable jury could find Defendant negligent based on its failure to follow its own hiring policies, (Dkt. No. 143, at 12), is similarly unavailing. Contrary to Plaintiffs' interpretation that Defendant's policy required "all associates 'regardless of position' to be background checked," (*see, e.g.*, Dkt. No. 143-1, at 3), the policy actually

---

[6] *See infra*, Section IV. B.

requires "[a]ll *Walmart, Fred Meyer, Corporate, and AC Lens associates*, regardless of position" to pass a background check." (Dkt. No. 143-4, at 1) (emphasis added). America's Best associates are expressly excluded from this provision. Defendant's corporate representative confirmed, testifying that "America's Best optometric technicians [were] not required to take background checks." (Dkt. No. 141-18, at 133). The only policy provision applying to all employment candidates, regardless of location, states that background checks must be completed for "[a]ny candidate noting on their application for employment that they have a prior conviction." (Dkt. No. 143-4, at 1). Because Vicioso did not indicate on his application that he had a prior conviction, (Dkt. No. 156-1, at 2), Defendant did not conduct a background check. (Dkt. No. 141-5, at 61).

Even if Defendant's policy required it to complete a background check on Vicioso, its failure to do so is immaterial because it lacked knowledge of "facts that would lead a reasonably prudent person to investigate [him]." *See Hashimi*, 221 N.Y.S.3d at 666. In *Hashimi*, the plaintiff brought a negligent hiring claim against defendants after their employee attempted to record her changing in a store fitting room. *Id.* at 665–666. The plaintiff averred that the defendants were negligent because they violated their internal hiring policy by failing to conduct a background check on the employee. *Id.* at 666. The court found this contention "without merit," citing the absence of a "common-law duty to institute specific procedures for hiring employees unless the employer knows of facts that would lead a reasonably prudent person to investigate the prospective employee." *Id.* The same principle applies here.

In addition, it does not matter that Defendant would have discovered Vicioso's criminal history had it run a background check on him. *See Samoya W. v. 3940 Carpenter Ave., LLC*, 131 N.Y.S.3d 550, 550–51 (App. Div. 2020) (reversing denial of defendants' summary judgment

motion on plaintiffs' negligent hiring claim, finding that "[t]he fact that [the employee] was a registered sex offender does not avail plaintiffs" because "[t]here [was] no evidence that, prior to the incident in question, [the employee] ever did anything that should have indicated to his employer that he had a propensity to commit sexual abuse or any other crimes" ).

*Nellenback v. Madison County*, 203 N.Y.S.3d 774 (App. Div. 2024), *aff'd*, No. 37, 2025 WL 1127776, 2025 N.Y. LEXIS 507 (N.Y. Apr. 17, 2025), is another analogous case. There, the plaintiff asserted a negligent hiring claim against the defendant after he was sexually assaulted as a child by a caseworker for the county's Department of Social Services. 203 N.Y.S.3d at 775. The plaintiff alleged that the defendant did not adhere to hiring guidelines issued by the New York State Department of Social Services, which required the defendant to seek out professional references for a prospective caseworker. *Id.* at 777. The court agreed with the trial court's finding that the defendant did not follow the state's hiring guidelines but nevertheless held that "the failure to identify any proof that could have provided defendant with knowledge of [the caseworker's] propensity to sexually abuse children [was] fatal to plaintiff's claim for negligent hiring. *Id.*

Here, Defendant likewise failed to follow internal guidelines on checking references. (*See* Dkt. No. 141-5, at 61–62; Dkt. No. 143-6, at 1). And also like in *Nellenback*, where "[the caseworker's] application materials fail[ed] to provide any indication that further inquiry was necessary," 203 N.Y.S.3d at 777, Vicioso's application materials did not indicate to Defendant that it should have looked further. Because Plaintiffs have not pointed to any evidence that Defendant knew any facts that would lead a reasonably prudent person to investigate Vicioso at the time he was hired, Plaintiffs' negligence claims pertaining to Vicioso's hiring do not survive summary judgment.

15

The cases that Plaintiffs rely on to show otherwise are factually distinguishable. For example, Plaintiffs cite to *Sandoval v. Leake & Watts Services, Inc.*, 136 N.Y.S.3d 306 (App. Div. 2020), to support the proposition that "where an employer's own policies show that a background check or the checking of references is appropriate for the responsibilities [of employment], then an employer can be found to be negligent for failing to follow its own policies." (Dkt. No. 143, at 9). In *Sandoval*, an intellectually disabled adult was intentionally burned by an employee of the residential facility where he lived. 136 N.Y.S.3d at 308. His guardians brought a negligent hiring claim on his behalf against the nonprofit that operated the facility. *Id.* The court affirmed the denial of the defendant's motion for summary judgment on the plaintiffs' claim, disagreeing with the defendant's argument that there was nothing in the record to demonstrate notice of the employee's violent propensity. *Id.* at 308, 312. The employee's job application stated that he had been "let go" from his most recent employment working with intellectually disabled children. *Id.* at 311. Even though the employer did not follow "its own internal hiring procedures" by checking the employee's references, *id.* at 310, the employee's application itself created the triable issue as to whether the defendant "should have known of the employee's propensity to commit injury." *See id.* at 312–13.

In this case however, there was nothing in Vicioso's application that warranted Defendant to inquire further into his background. There is no evidence from which a jury could find that Defendant "knew or should have known that [he] had a propensity for the conduct which caused [Plaintiffs'] injury." *See Olsen*, 211 N.Y.S. at 278 (citations and brackets omitted). Therefore, Defendant is entitled to summary judgment on the negligence claims arising from Vicioso's hiring.

### B.    Negligent Retention and Supervision

To state a claim for negligent retention or for negligent supervision under New York law, the plaintiff must prove that: "(1) the employer had actual or constructive knowledge of the employee's propensity for the sort of behavior which caused the injured party's harm; (2) the employer knew or should have known that it had the ability to control the employee and of the necessity and opportunity for exercising such control; and (3) the employee engaged in tortious conduct on the employer's premises or using property or resources available to the employee only through their status as an employee, including intellectual property and confidential information." *Moore Charitable Found. v. PJT Partners, Inc.*, 217 N.E.3d 8, 14 (N.Y. 2023).

The parties' dispute centers around the first element. Defendant argues that it "lacked any notice or awareness of the prior acts or allegations involving Vicioso." (Dkt. No. 141-35, at 12). Plaintiffs disagree, claiming that the former employee, Muckey; the manager, Martinez; and the assistant manager, Swansbrough; all knew that Vicioso was on probation. (Dkt. No. 143, at 13).

Although Muckey had personal knowledge of Vicioso's probation, Plaintiff has not cited to any admissible evidence that the managers knew. "The Court may only consider admissible evidence in ruling on a motion for summary judgment." *AngioDynamics, Inc.* 537 F. Supp. 3d at 318 (citation and internal quotation marks omitted). As a result, a party cannot rely on inadmissible hearsay in opposing a motion for summary judgment. *Factory Assocs. & Exps., Inc. v. Lehigh Safety Show Co. LLC*, No. 05-cv-837, 2007 WL 1834599, at *4, 2007 U.S. Dist. LEXIS 46290, at *11 (N.D.N.Y. June 26, 2007) (citing *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985). Plaintiffs cannot rely on Muckey's testimony about what Vicioso said for its truth at the summary judgment stage because it is inadmissible hearsay. *See* Fed R. Evid. 801(c), 802; *City of Almaty, Kazakhstan v. Sater*, No. 19-cv-2645, 2025 WL 2256759, at *2, 2025 U.S. Dist. LEXIS 153506, at *6 (S.D.N.Y. Aug. 6,

2025) (citation omitted) ("If there is out-of-court testimony about what [the declarant] allegedly told the plaintiffs, that would be hearsay and excluded if it is a third party recounting what [the declarant] told the plaintiffs and is offered for the truth of the alleged fact of what [the declarant] told the plaintiffs").

Plaintiffs also rely on Muckey's personal knowledge that Vicioso was on probation, citing to Muckey's deposition testimony that "[Vicioso's] probation officer actually had to come to [their] apartment and check it." (Dkt. No. 141-14, at 30–31). Plaintiffs have, however, failed to raise a genuine issue of material fact that this knowledge is imputed to Defendant. *See BL Doe 5 v. Fleming*, 215 N.Y.S.3d 628, 633 (App. Div. 2024) ("Whether the employee's knowledge may be imputed to the employer hinges upon whether that knowledge was *acquired while the employee was acting within the scope of their employment*." (emphasis added) (citing *Center v. Hampton Affiliates, Inc.*, 488 N.E.2d 828, 829 (N.Y. 1985)). Because Plaintiffs have failed to raise a genuine issue of material fact regarding whether Defendant "had actual or constructive knowledge of [Vicioso's] propensity for the sort of behavior which caused [Plaintiffs'] harm," *see Moore Charitable Found.* 217 N.E.3d at 14, summary judgment on Plaintiffs' negligence claim as to Vicioso's retention is warranted.

Plaintiffs claim that Defendant negligently supervised Vicioso because Muckey "fail[ed] to intervene after the preexam with Ms. Hinkle went far beyond the acceptable limits" or, alternatively, because Defendant "fail[ed] to have any supervisor present." (Dkt. No. 143, at 13–14). However, notice of an "an employee's propensity for the sort of behavior which caused [Plaintiffs'] harm," *see Moore Charitable Found.*, 217 N.E.3d at 14, cannot be from the incident itself. *Higazy v. Millenium Hotel and Resorts*, 346 F.Supp.2d 430, 455 (S.D.N.Y. 2004) ("[Defendant's] first indication that [its employee] might have a propensity to lie to his superiors

or to law enforcement appears to be the very incident of which [Plaintiff] complains. This is an insufficient basis for recovering on a claim of negligent hiring, retention, training and supervision." (citing *Santamaria v. Citrynell*, 609 N.Y.S.2d 902, 904 (App. Div. 1994)) *aff'd in part, rev'd in part on other grounds and remanded sub. nom. Higazy v. Templeton*, 505 F.3d 161 (2d Cir. 2007). A plaintiff must show that "the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' *prior to the injury's occurrence*." 385 F.3d 232, 235. *See Maldonado v. City of New York*, No. 11 Civ. 3514, 2014 WL 787814, at *13, 2014 U.S. Dist. LEXIS 26239, at *40 (S.D.N.Y. Feb. 26, 2014) (emphasis added) (citations and internal quotation marks omitted).

Plaintiffs also cite to evidence generated after this incident to support their negligent supervision claim, relying on statements from Vicioso and Defendant's former employee, Rodabaugh. Vicioso told law enforcement that he had acted similarly "with other patients 3-5 times" before. (Dkt. No. 141-33, at 20). Rodabaugh testified that after the incident, he had to clean "multiple areas" of "fluids" from the floor that he could only see with the "blue, black light" that police officers used to illuminate the floor. (Dkt. No. 141-30, at 35). Again, this evidence is insufficient to raise a genuine issue of material fact that Defendant knew of Vicioso's propensity to masturbate in the preexam room *before* the incident occurred. *See Maldonado*, 2014 WL 787814, at *13, 2014 U.S. Dist. LEXIS 26239, at *40. Thus, Plaintiffs' negligence claims based on Vicioso's supervision is likewise subject to summary judgment.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's Motion for Summary Judgment (Dkt. No. 141) is **GRANTED** in its entirety; and it is further

**ORDERED** that Defendant's Motion to Preclude Expert Testimony (Dkt. No. 142) is

**DENIED** as moot in light of this decision; and it is further

**ORDERED** that the complaint is **DISMISSED with prejudice** and the Clerk is

respectfully requested to close this case.

**IT IS SO ORDERED.**

Dated: <u>September 25, 2025</u>
       Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge